# SEALED
**BY THE ORDER OF THE COURT**

**WARNING:** **THIS IS A SEALED DOCUMENT CONTAINING NON-PUBLIC INFORMATION**

CLARE E. CONNORS #7936
United States Attorney
District of Hawaii

MICHAEL F. ALBANESE #9421
Assistant U.S. Attorney
Room 6100, PJKK Federal Building
300 Ala Moana Boulevard
Honolulu, Hawaii 96850
Telephone: (808) 541-2850
Michael.albanese@usdoj.gov

FILED IN THE
UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII
Nov 09, 2023
Lucy H. Carrillo, Clerk of Court

Attorneys for Plaintiff
UNITED STATES OF AMERICA

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| UNITED STATES OF AMERICA, | MAG. NO. 23-01635 WRP |
| Plaintiff, | CRIMINAL COMPLAINT; AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT |
| v. | |
| EDWARD CASPINO, | |
| Defendant. | |

## CRIMINAL COMPLAINT

I, the undersigned complainant, being duly sworn, state that the following is true and correct to the best of my knowledge and belief.

1

### Count 1
Distribution of 50 Grams or more of Methamphetamine
(21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A))

On or about July 13, 2021, within the District of Hawaii, EDWARD CASPINO, did knowingly and intentionally possess, with intent to distribute, 50 grams or more of methamphetamine, its salts, isomers, and salts of its isomers, a Schedule II controlled substance.

All in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(A).

### Count 2
Distribution of 50 Grams or more of Methamphetamine
(21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A))

On or about July 23, 2021, within the District of Hawaii, EDWARD CASPINO, did knowingly and intentionally possess, with intent to distribute, 50 grams or more of methamphetamine, its salts, isomers, and salts of its isomers, a Schedule II controlled substance.

All in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(A).

### Count 3
Distribution of 50 Grams or more of Methamphetamine
(21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A))

On or about July 29, 2021, within the District of Hawaii, EDWARD CASPINO, did knowingly and intentionally possess, with intent to distribute, fifty

50 grams or more of methamphetamine, its salts, isomers, and salts of its isomers, a Schedule II controlled substance.

All in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(A).

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

I further state that I am a Special Agent with the U.S. Drug Enforcement Administration ("DEA"), and that this Complaint is based upon the facts set forth in the attached "Affidavit in Support of Criminal Complaint," which is incorporated herein by reference.

DATED: HONOLULU, HAWAII: November 9, 2023

GABRIEL GRAY
Special Agent
Drug Enforcement Administration

Sworn to under oath before me telephonically, and attestation acknowledged pursuant to Federal Rule of Criminal Procedure 4.1(b)(2).

DATED: Honolulu, Hawaii, November 9, 2023.

Wes Reber Porter
United States Magistrate Judge

4

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, GABRIEL GRAY, being duly sworn, state the following is true and correct to the best of my knowledge and belief:

### INTRODUCTION

1. I am a Special Agent with the U.S. Drug Enforcement Administration (DEA), and have been since January 2020. I am an investigative officer within the meaning of Title 18, United States Code; that is, an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Title 21 of the United States Code. I am currently assigned to the DEA's Honolulu District Office, but was previously assigned to the DEA's San Diego Field Division. Before being assigned to the DEA's San Diego Field Division, I completed eighteen weeks of training at the DEA Academy in Quantico, Virginia. Prior to my employment with the DEA, I was an officer with the San Diego Police Department (SDPD), and prior to that I was employed as an officer with the Washington D.C., Metropolitan Police Department (MPD). During my tenure with both the SDPD and MPD, I was assigned to specialized units which solely conducted proactive operations; these operations consisted of working with federal law enforcement agencies and local narcotics units to pursue violations of federal law and crimes related to the California Health and Safety Code.

2. During my law enforcement career, I have received formal training in

5

narcotics and gang investigations. I have participated in multiple separate investigations involving the distribution of controlled substances and firearms. As part of these investigations, I have used various investigative techniques, including physical and stationary surveillance, informants and cooperating sources, court authorized interceptions, pen register/trap and trace devices, telephone toll analysis, undercover operations, physical searches, mail covers, and electronic examinations of evidence. Through these previous investigations, I have obtained knowledge regarding the ordinary meaning of controlled substance slang and jargon. I have monitored and reviewed hundreds of recorded telephone calls and text messages pursuant to Title III court orders in narcotics and gang-related investigations as well as handled confidential sources with access to drug dealers and gang members

3. This affidavit is intended to show merely that there is sufficient probable cause for the specified violation of federal law and does not set forth all of my knowledge about this matter.

## PROBABLE CAUSE

4. This affidavit is submitted for the purpose of establishing probable cause that on or about July 13, 23, and 29, 2021, within the District of Hawaii, EDWARD CASPINO ("the Defendant") engaged in conduct that violated Title 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A) (Distribution of 50 Grams or more of

Methamphetamine).

## A. Background of the CASPINO Investigation and Introduction of the Confidential Source.

5. In July of 2021, a confidential source[1], hereinafter referred to as "CS", was used to gather evidence of drug trafficking being conducted by CASPINO and the criminal organization he is known to lead; the criminal organization is known as "Westside", and it has been relayed to me through multiple law enforcement sources, and other confidential sources, that CASPINO is the leader of this gang. Specifically, the CS was used, at the direction of the DEA, to conduct three controlled purchases of methamphetamine from CASPINO and his organization.

## B. First Controlled Purchase of Methamphetamine (July 13, 2021).

6. On July 13, 2021, the CS visited CASPINO at his residence in Waianae,

---

[1] In December 2020, DEA personnel recruited the CS after confronting him/her about selling methamphetamine to an undercover officer. Thereafter, the CS immediately agreed to cooperate with law enforcement. The CS has provided tested and reliable information regarding CASPINO, and the CS' information regarding CASPINO has been corroborated by other sources, including telephone subscriber / toll records, physical surveillance, information provided by other confidential sources, and the consensually-recorded interactions between the CS, CASPINO, and others. The CS has not yet been charged, but began cooperating with the DEA in hopes of potential prosecutorial consideration and to receive leniency when ultimately sentenced. The DEA has made no promises to the CS in regards to the CS receiving leniency for his/her cooperation. At the time of the events relevant to this complaint, the DEA had not promised or arranged any financial compensation for the CS; however, well after the events in this complaint the DEA has provided the CS with financial compensation to assist in moving out of Hawaii.

7

Hawaii, for the purpose of re-establishing contact with him as they had been long-time friends but had not spoken for some time. During the conversation, the CS broached the notion of procuring methamphetamine from CASPINO in the future; however, to the CS' surprise, CASPINO "fronted"[2] a pound of methamphetamine to him/her right then. After leaving CASPINO's residence, the CS immediately contacted his/her DEA handlers to notify them about what occurred, at which time DEA personnel met the CS and took possession of the methamphetamine. A presumptive test was conducted on the methamphetamine, which showed a positive indication that the substance was in fact methamphetamine. Furthermore, the DEA's Southwest Laboratory conducted additional testing of the substance the CS acquired from CASPINO, which confirmed that it contained approximately 420 grams of pure methamphetamine.

7.  On July 14, 2021, DEA personnel planned an operation to pay CASPINO back for the pound of methamphetamine he had "fronted" to the CS the day prior. The CS was provided with $6,500.00 of government funds and an audio recording/transmitting device. DEA personnel observed the CS drive to CASPINO's residence. Upon the CS' arrival at CASPINO's residence, he/she met

---

[2] Based on my training experience, I know "fronting" to mean that CASPINO provided the methamphetamine to the CS without payment, with the expectation that the CS would pay for the methamphetamine at a later date. This is a common drug trafficking technique that frequently indicates a level of trust between the individuals involved.

with CASPINO and paid him the aforementioned $6,500.00. I have reviewed the audio recording of the above-described encounter, and it is consistent with the information provided by the CS.

C. **Second Controlled Purchase of Methamphetamine (July 23, 2021).**

8. On July 22, ~~2023~~ 2021 GG, the CS placed a recorded phone call to CASPINO, at the direction of DEA agents, asking to "hang out" with him. CASPINO agreed, and the parties agreed to meet the following day.

9. On July 23, ~~2023~~ 2021 GG, the CS was provided with $6,500.00 of government funds and an audio recording/transmitting device. The CS then drove to CASPINO's residence. Upon the CS arriving, DEA agents observed the CS meet with CASPINO in the rear of the residence via video-recorded aerial surveillance. The CS later reported to his/her DEA handlers, as corroborated by the aforementioned audio recording, that CASPINO sold the CS one pound of methamphetamine for $6,500.00 as anticipated. The CS also reported that during his/her conversation with CASPINO, they discussed potentially doing larger-scale methamphetamine deals in the future.

10. Immediately after the deal, the CS departed CASPINO's residence and traveled to give possession of the pound of methamphetamine he/she had just acquired to DEA agents. A presumptive test was conducted on the methamphetamine, which showed a positive indication that the substance was in fact

9

methamphetamine. Furthermore, the DEA's Southwest Laboratory conducted additional testing of the substance the CS acquired from CASPINO, which confirmed that it contained approximately 420 grams of pure methamphetamine.

**D.   Third Controlled Purchase of Methamphetamine (July 29, 2021).**

11.   On July 29, 2021, the CS placed a recorded phone call, at the direction and in the presence of DEA agents, to CASPINO. During the course of the conversation, the CS inquired about meeting CASPINO to discuss future drug transactions; the CS did not use specific language related to drug trafficking so as to not make CASPINO uncomfortable, and only stated that he/she wished to "talk story". CASPINO agreed, at which time DEA agents provided the CS with an audio recording/transmitting device and a video recording device. The CS then drove to CASPINO's residence; however, upon arriving the CS discovered that CASPINO was not present. CASPINO's nephew, however, was present and handed the CS a small bag which contained one pound of methamphetamine.

12.   The CS departed the residence, with the methamphetamine, and while *en route* to give possession of the methamphetamine to waiting DEA agents, he/she received a phone call from CASPINO. The CS mentioned the idea of introducing CASPINO to a friend, who in fact would have been an undercover DEA agent, and stated that was the reason he/she went to see him; however, CASPINO responded by stating he did not trust any one but the CS.

10

13. The CS then arrived at the DEA agents' location and gave possession of the methamphetamine to them. A presumptive test was conducted on the methamphetamine, which showed a positive indication that the substance was in fact methamphetamine. Furthermore, the DEA's Southwest Laboratory conducted additional testing of the substance the CS acquired from CASPINO, which confirmed that it contained approximately 408 grams of pure methamphetamine.

14. On July 30, 2021, the CS placed a recorded phone call to CASPINO, at the direction and in the presence of DEA agents, asking if he/she could come see him later that day. CASPINO agreed, at which time the CS was provided an audio recording/transmitting device, a video recording device, and $6,500.00 in government funds to pay for the pound of methamphetamine that had been acquired the day prior. The CS then traveled directly to CASPINO's residence. The CS later reported to his/her DEA handlers that he/she had a 15-minute conversation with CASPINO about introducing him to his/her ostensible friend and also paid CASPINO for the pound of methamphetamine that had been "fronted" the day before. After the CS met with CASPINO, he/she departed CASPINO's residence. I have reviewed the audio and video recordings from this incident, and the recordings corroborate the CS's statements.

//

//

11

## CONCLUSION

14. Based on the foregoing, I believe there was probable cause to arrest EDWARD CASPINO for the violations of federal law set forth above.

FURTHER AFFIANT SAYETH NAUGHT.

DATED: Honolulu, Hawaii, November 9, 2023.

Respectfully submitted,

Gabriel A. Gray
Special Agent
Drug Enforcement Administration

Sworn to under oath before me telephonically, and attestation acknowledged pursuant to Federal Rule of Criminal Procedure 4.1(b)(2),

Based upon the foregoing, the undersigned Judicial Officer finds that there is probable cause to believe that defendant above-named committed the crimes charged in the Criminal Complaint, this 9th day of November, 2023.

Wes Reber Porter
United States Magistrate Judge

12